NO. 07-04-0304-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



AUGUST 2, 2005



______________________________


 

THE STATE OF TEXAS, APPELLANT



V.



ANDREW BENNETT LOCKHART, APPELLEE


 _________________________________



FROM THE 181ST DISTRICT COURT OF POTTER COUNTY;



NO. 48,683-B; HONORABLE JOHN BOARD, JUDGE


_______________________________



Before REAVIS and CAMPBELL, JJ. (1)

OPINION


 This is a State's appeal from an order granting appellee Andrew Bennett Lockhart's
motion to suppress evidence obtained as a result of a traffic stop. We will reverse the trial
court's order.

 Lockhart's arrest and prosecution arose out of a traffic stop by Department of Public
Safety trooper Chris Ecker. On the evening of November 27, 2003, Lockhart and Daniel
DeGuardi were driving on Interstate 40 near Amarillo, traveling from Tucson, Arizona to
Ohio in DeGuardi's Ford Expedition. Lockhart was driving in the right lane of the highway
when he passed Trooper Ecker's car parked on the shoulder of the road near mile marker
62. Ecker had just completed issuing a traffic citation and put his patrol car in drive when
he saw the truck pass "pretty close" to his patrol car, drawing his attention. Although Ecker
did not believe any offense had been committed, he decided to "go look at his driving." (2) 

 Ecker pulled onto the roadway and caught up with the truck "fairly quickly." Ecker
denied racing to catch the truck but, when questioned about stopping the truck
approximately one mile from his initial location, he noted his patrol car was a Chevrolet
Camaro and "it will catch him." After Ecker caught up with the truck he said the right tires
crossed over the white line on the right side of the roadway (3) for a few seconds "more than
once." Based on his observation, Ecker decided to stop the driver. Ecker turned on his
emergency lights and Lockhart stopped near mile marker 63. 

 Ecker prepared a warning citation for "driving on improved shoulder" to issue to
Lockhart. He then obtained permission from DeGuardi, the owner, to search the vehicle
where he discovered three of five bags in the cargo area contained packages of marijuana. 
That discovery lead to Lockhart's prosecution. (4) 

 At a hearing on Lockhart's motion to suppress, he argued the initial stop was illegal. (5) 
Lockhart and Ecker testified, Lockhart denying that he crossed over the line or hit the
rumble strip. (6) After hearing the testimony, the court granted the motion to suppress,
commenting the trooper had not seen any violation of the law when he decided to pursue
Lockhart and follow him, awaiting a violation to justify a traffic stop.

 The State timely perfected appeal from the order. See Tex. Code Crim. Proc. Ann.
art. 44.01(a)(5) (Vernon 2003). The trial court later made findings of fact and conclusions
of law. They included findings that as Ecker caught up to Lockhart's vehicle he saw its right
tires "go over the solid white stripe 'a couple of times'," and the tires did not make contact
with the rumble strip. The conclusions of law stated, in part:

 2. Trooper Ecker did not observe . . . Lockhart commit a criminal offense prior
to the traffic stop.


 3. Lockhart's vehicle was not being operated in violation of a traffic law
immediately prior to the traffic stop[.]


 4. Trooper Ecker initiated his stop of Lockhart's vehicle on a "hunch."


 5. Trooper Ecker's stop of Lockhart was primarily motivated by a non-community care-taking purpose, and 


 6. There was no properly articulated reason to stop the vehicle in the first
place, therefore, there was no reasonable suspicion or probable cause to
support the traffic stop of Lockhart's vehicle.

 The State now presents a single issue asserting the trial court abused its discretion
in granting the motion to suppress because the court failed to properly apply the law. 

 In a motion to suppress hearing, the trial court is the sole trier of fact and judge of
the credibility of the witnesses and the weight to be given their testimony. State v. Ross,
32 S.W.3d 853, 855 (Tex.Crim.App. 2000). The judge may believe or disbelieve all or any
part of a witness's testimony, whether or not the testimony is controverted. Id. Under the
bifurcated standard of appellate review for a ruling on a motion to suppress described in
Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997), we review the court's ruling
for an abuse of discretion, but give almost total deference to the trial court's findings of fact
especially when the findings are based on an evaluation of credibility and demeanor. Ross,
32 S.W.3d at 856. We review de novo the trial court's application of the law of search and
seizure to its findings of fact. Id., Carmouche v. State, 10 S.W.3d 323, 327-28
(Tex.Crim.App. 2000). 

 Here, the trial court was presented with a clear conflict in the testimony concerning
whether Lockhart crossed the fog line and drove on the shoulder. The trial court did not
accept all of Ecker's testimony. As noted, it rejected his assertion Lockhart "probably" hit
the rumble strip on the shoulder. The court nonetheless found that "As Ecker caught up
to the subject vehicle, he observed Lockhart's right side tires go over the solid white stripe
'a couple of times'." Although Lockhart does not expressly challenge the finding, he
emphasizes that the trooper's testimony concerning his commission of a traffic violation
was disputed. He quotes his own testimony in which he denied committing any traffic
violation after he passed Ecker's vehicle and before he was stopped, and specifically
denied driving over the fog line. The trial court's finding of fact, though, states otherwise,
and trooper Ecker's testimony clearly supports the finding. Responding to a question
asking him to describe the violation he saw, Ecker testified: "The driver operated the vehicle
so that the right side tires - the tires on the right side of the vehicle, the passenger side of
the vehicle, crossed the solid white stripe, driving partially on the shoulder." When asked
how far the tires crossed the line, he stated, "Enough to see blacktop in between the tire
and the white stripe." He stated each transgression of the shoulder lasted "[n]o more than
a few seconds. Just enough to drive on it, and then come back." As reflected in the trial
court's finding, Ecker later indicated that the "right side tires crossed over the solid white
stripe a couple times." It was the role of the trial court to evaluate the credibility and
demeanor of the witnesses and we will, as we must, defer to its determination of the
historic facts that the record supports. Ross, 32 S.W.3d at 856. 

 The Transportation Code authorizes a peace officer to arrest without warrant a
person found committing a violation of the Code's subtitle that sets forth Rules of the Road. 
Tex. Transp. Code Ann. § 543.001 (Vernon 1999); State v. Gray, 158 S.W.3d 465, 469
(Tex.Crim.App. 2005); Tyler v. State, 161 S.W.3d 745, 748 (Tex.App.-Fort Worth 2005, no
pet.). See also Tex. Code Crim. Proc. Ann. art. 14.01(b) (Vernon 1997). Witnessing what
he reasonably believes to be a traffic violation provides the officer with probable cause to
conduct a traffic stop and detain the offender. (7) Tyler, 161 S.W.3d at 748; Nuttall v. State,
87 S.W.3d 219, 222 (Tex.App.-Amarillo 2002 no pet.); see Whren v. United States, 517
U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). See also Guzman, 955 S.W.2d at 87
(probable cause is measured against belief of a reasonable person).

 Section 545.058(a) of the Transportation Code provides that an operator of a vehicle
may drive on an improved shoulder to the right of the main portion of the roadway if that
operation is necessary and may be done safely, but only for certain listed purposes. Tex.
Transp. Code Ann. § 545.058(a) (Vernon 1999). No evidence suggests that it was
necessary for any of those listed purposes for Lockhart to drive on the shoulder. In the
face of the trial court's finding that he did so, we must conclude that the trooper had
probable cause to initiate the traffic stop and detain Lockhart. (8) See Tyler, 161 S.W.3d at
750 (finding probable cause for traffic stop for violation of § 545.058(a)); Martinez v. State,
29 S.W.3d 609, 612 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd) (suggesting violation of
driving on shoulder statute as alternative justification for stop).

 Lockhart also argues the trial court effectively determined that the trooper decided
to stop him when Lockhart failed to change lanes ("pull over," in the trooper's words) when
he passed the trooper's vehicle at milepost 62. Examination of the officer's subjective
motive for a traffic stop is not a part of the court's evaluation of the reasonableness of the
detention under search and seizure law. See Crittenden v. State, 899 S.W.2d 668 (Tex.
Crim.App. 1995); Garcia v. State, 827 S.W.2d 937 (Tex. Crim.App. 1992); Russell v. State,
904 S.W.2d 191, 198-99 (Tex.App.-Amarillo 1995 pet. ref'd). The trial court's conclusions
of law include one, perhaps better termed a finding of fact, stating that Trooper Ecker
initiated his stop of Lockhart's vehicle on a "hunch." Even if true, Ecker's subjective motive
does not render invalid his objectively reasonable stop of Lockhart based on his
observation of a traffic violation. See Russell, 904 S.W.2d at 199.

 Accordingly, we find the trial court abused its discretion in its application of the law
to the facts by granting the motion to suppress. The order of suppression is reversed, and
the cause remanded to the trial court for further proceedings.


 James T. Campbell

 Justice




Do not publish.
1. Former Chief Justice Phil Johnson was on the panel that heard oral argument. He
did not participate in the decision. Tex. R. App. P. 41.1(b).
2. The trooper further testified, "I wondered why he didn't pull over. Usually people
will pull over."
3. Several opinions identify this stripe as the "fog line" and we will use that term here.
4. Ecker arrested both occupants. This record does not reflect whether DeGuardi
was prosecuted.
5. Lockhart also argued that DeGuardi did not have authority to consent to the search
of the bags. Applying the holding in State v. Allen, 53 S.W.3d 731, 733 (Tex.App.-
Houston [1st Dist.] 2001, no pet.), the trial court overruled Lockhart's challenge to the
consent given by the truck's owner. That ruling is not challenged here. 
6. Although Ecker's car was equipped with a video camera, he testified the equipment 
malfunctioned and there was no recording of the events at issue here.
7. Case law also sometimes applies a "reasonable suspicion" standard to traffic stops
for Rules of the Road violations. See, e.g., Ford v. State, 158 S.W.3d 488, 492 (Tex.Crim.
App. 2005) (citing Balentine v. State, 71 S.W.3d 763, 768 (Tex.Crim.App. 2002)). But cf.
State v. Kurtz, 152 S.W.3d 72, 79 (Tex.Crim.App. 2004) (distinguishing "arrests" for Rules
of the Road violations from other investigative detentions).
8. We express no opinion on the State's contentions that the trooper's stop of
appellant also was justifiable because of a reasonable suspicion Lockhart was driving while
intoxicated and because it was a proper exercise of the trooper's community caretaking
function. 



93, 73rd Leg., R.S., ch.
999, § 16, 1993 Tex. Gen. Laws 4373, 4376-81, repealed by, Act of May 22, 2003, 78th
Leg., R.S., ch. 1274, § 26, 2003 Tex. Gen. Laws 3611, 4138 (current version at § 981.001-.222). (6) 

 The Segers contend that Insurers cannot enforce any defenses derived from the
CGL policy, as a matter of law, because Insurers were unauthorized insurers when the
policy was issued. Insurers contend that, even though they were and are unauthorized
insurers, the statute does not preclude an unauthorized insurer's reliance on contract-based defenses in suits initiated by the insured (7) or, if the statute does preclude an
unauthorized insurer from asserting its contract-based defenses, the preclusion is
inapplicable to Insurers because they met the surplus lines insurance exception. 

 Initially, because the surplus lines exception changed with the 1993 amendments,
we must determine the law applicable to the current case. The Segers contend that,
because the policy at issue was entered into in 1992, the laws existing at the time the
contract was made became part of the contract and govern the transaction. Insurers
contend that the 1993 amendments were procedural or remedial in nature and, therefore,
are properly applied retroactively. Courts generally presume that an amendment to a
statute is to be applied prospectively and not retroactively. Subaru of Am., Inc. v. David
McDavid Nissan, Inc., 84 S.W.3d 212, 219 (Tex. 2002). However, this general rule does
not apply when the amendment is procedural or remedial, unless the retroactive application
of the amendment would affect a party's vested rights. Id. at 219-20. 

 The 1993 amendments to articles 1.14-1 and 1.14-2 were intended to provide
"reasonable and practical safeguards" to protect Texas consumers. Amended article 1.14-2, § 1. An unauthorized insurer who issues a policy to a Texas consumer is penalized by,
among other things, being precluded from enforcing any defenses contained within the
unauthorized policy. See amended article 1.14-1, § 9; Lexington Ins. Co., 209 S.W.3d at
89. However, because surplus lines insurance is sometimes necessary to insure risks for
which coverage cannot be obtained from a licensed, resident insurer, see amended article
1.14-2, § 1; Mid-Am. Indem. Ins. Co. v. King, 22 S.W.3d 321, 322 (Tex. 1995),
unauthorized insurers may become "eligible" to issue surplus lines policies to Texas
consumers, provided that the insurer complies with strict capitalization and registration
requirements. See amended article 1.14-1, § 8; amended article 1.14-2, § 3; Mid-Am.
Indem. Ins. Co., 22 S.W.3d at 323. As these surplus lines insurers remain unauthorized
insurers, they are subject to the remedial penalties imposed on an unauthorized insurer
conducting the business of insurance in the state, including the loss of their contract-based
defenses, unless they strictly comply with the eligibility requirements of amended article
1.14-2. See Lexington Ins. Co., 209 S.W.3d at 89. Because the 1993 amendment to
article 1.14-1, section 8, affects only the remedies available to an insured when article
1.14-2 is violated by the insurer, we hold that the amended versions of these articles apply
to the present case. (8) 

 While the parties and the foregoing analysis cite the former and amended articles
1.14-1 and 1.14-2, these articles were repealed and recodified by the 76th and 78th
Legislatures. See Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws
486, 538; Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 26, 2003 Tex. Gen. Laws 3611,
4138. However, the Legislature expressly indicated that no substantive change in the law
was intended by either Act. See Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, § 6, 1999
Tex. Gen. Laws 486, 538 ("This Act is intended as a recodification only, and no substantive
change in law is intended by this Act."); Act of May 22, 2003, 78th Leg., R.S., ch. 1274, §
27, 2003 Tex. Gen. Laws 3611, 4139 (same). As a result and based on our determination
that the 1993 amendments should be applied retroactively, we will refer to the current
codification of the law when possible.

 It is undisputed that Insurers were unauthorized insurers at all times relevant to the
present case. Section 101.201(a) provides that, "An insurance contract effective in this
state and entered into by an unauthorized insurer is unenforceable by the insurer." (9) 
However, the former article 1.14-1, § 8, the amended article 1.14-1, § 8, and the recodified 
section 101.201(b) provide an exception to this prohibition for surplus lines insurance. The
Segers contend that Insurers could produce no evidence that the CGL policy in this case
was "lawfully procured surplus lines insurance" or, alternatively, the Segers conclusively
established that the CGL policy was not "lawfully procured surplus lines insurance" and,
therefore, Insurers are precluded from asserting their contract-based defenses under
former article 1.14-1, § 8. Insurers contend that they were entitled to rely on their contract-based defenses because they established that they met the surplus lines exception of
amended article 1.14-1, § 8, as a matter of law.

 The Segers' motion for summary judgment states that, for an insurer to raise any
contractual defense in a suit on the policy, the insurer must prove that it was either
authorized to do business in Texas or that the insurance at issue was "lawfully procured
surplus lines insurance." The Segers indicate that all references to provisions of the
Insurance Code in their motion are references to the version in effect when the coverage
was issued in 1992, i.e., the pre-amended versions of articles 1.14-1 and 1.14-2. The
Segers then allege that the CGL policy was issued in violation of former article 1.14-2, §§
2, 5, 6(a), 6(c), 6(d), 6(e), 6A(a6), (10) 7(a), 7(b), and 8. Ultimately, the Segers contend that,
because Insurers could present no evidence that they met the "lawfully procured surplus
lines insurance" exception or because the Segers had conclusively established that the
CGL policy was not "lawfully procured surplus lines insurance," the Segers were entitled
to summary judgment precluding Insurers from relying on their contractual defenses as a
matter of law.

 Because we have already held that the 1993 amendments to articles 1.14-1 and
1.14-2 were procedural or remedial and are to be applied retroactively, any violation of
former article 1.14-1 or 1.14-2 are of no effect on Insurers' ability to enforce its contract-based defenses in the policy. As we held above, the pre-amendment law, relied upon by
the Segers to support its motion for summary judgment, was rendered ineffective by the
1993 amendments and, as a result, violations of the pre-amendment provisions would not
result in a preclusion of Insurers' contract-based defenses. Therefore, we conclude that
the Segers' motion failed to expressly present grounds that would entitle the Segers to
summary judgment on coverage based on Insurers being precluded from asserting their
contract-based defenses. See Tex. R. Civ. P. 166a(c). Further, because the Segers'
motion cites ineffective law, we conclude that the Segers' motion failed to state the
elements upon which Insurers could produce no evidence relating to Insurers' right to
assert its contract-based defenses. See Tex. R. Civ. P. 166a(i). Because the Segers'
summary judgment motion presents no grounds upon which the trial court could have
granted summary judgment, we conclude that, to the extent the trial court based its grant
of summary judgment on coverage on the global preclusion of Insurers' contract-based
defenses, the trial court erred.

 Insurers appeal the denial of their motion for partial summary judgment on
coverage. Because surplus lines insurance is excepted from the general statutory
restriction on unauthorized insurers, the burden of proving every fact essential to the
invocation of the exception rests on Insurers. See Cramer v. Sheppard, 140 Tex. 271, 167
S.W.2d 147, 155 (1942); Risk Managers Int'l, Inc. v. State, 858 S.W.2d 567, 570
(Tex.App.-Austin 1993, writ denied). Thus, for Insurers to be entitled to summary
judgment on coverage, Insurers must establish that Insurers were eligible surplus lines
insurers and that the CGL policy was procured through a licensed surplus lines agent as
a matter of law, see § 101.201(b), and that the Segers' claims are not covered by the CGL
policy. 

 We will initially review the evidence regarding whether Insurers established that they
were eligible surplus lines insurers as a matter of law. An "eligible surplus lines insurer"
must comply with the requirements of sections 981.051-.065 of the Insurance Code. See
§ 981.002(1). The record contains a certification from Kathy A. Wilcox, Registration Officer
of the Texas Department of Insurance, that indicates, at all times pertinent to the present
case, both Yorkshire (11) and Ocean Marine (12) were unlicensed insurers which were eligible
to provide surplus lines insurance under each iteration of the statute and at all times
pertinent to the present case. We conclude that, because these certifications were
uncontroverted, the evidence conclusively established that Insurers were eligible surplus
lines insurers. (13) 

 However, more is required to meet the exception of section 101.201(b). In addition
to the insurer being eligible to provide surplus lines insurance, the insurance must be
procured through a licensed surplus lines agent. § 101.201(b). The record includes a
statement from Matt Ray, Deputy Commissioner of the Licensing Division of the Texas
Department of Insurance, indicating that London American Risk Specialists, Inc. (LARSI),
held a surplus lines agency license that was issued on February 14, 1984 and was due to
expire October 25, 2005, if not timely renewed. Notably, the cover note for the CGL policy
specifically indicates that the insurance was placed through LARSI. However, the Segers
correctly indicate that this evidence identifies LARSI as holding a license as a managing
general agency. Section 981.220(b) restricts a surplus lines agent whose license is
granted to it as a managing general agent, that is not also licensed under Article 21.14 of
the Insurance Code, (14) to business that originates through a licensed general property and
casualty agent. Thus, for LARSI's surplus lines agent license to meet the exception found
in section 101.201(b), the transaction must have been directed through an agent that was
a licensed general property and casualty agent. § 981.220(b).

 No record evidence establishes that the CGL policy was directed through an agent
that was a licensed general property and casualty agent. (15) As such, Insurers have failed
to prove every fact essential to the invocation of the section 101.201(b) surplus lines
insurance exception and the trial court did not err in overruling Insurers' partial summary
judgment motion on coverage. See Cramer, 167 S.W.2d at 155; Risk Managers Int'l, Inc.,
858 S.W.2d at 570. We affirm the trial court's denial of Insurers' partial summary judgment
on the issue of coverage. 

C. Coverage

 While we have held that the trial court erred in granting the Segers summary
judgment on the issue of coverage to the extent that summary judgment was based on the
preclusion of Insurers' contract-based defenses, because the trial court did not specify the
grounds upon which it granted summary judgment on the issue of coverage, we must
affirm the judgment if it is supported by any meritorious ground expressly presented in the
motion and preserved for appellate review. S.S., 858 S.W.2d at 380. In their motion for
summary judgment, the Segers alternatively contended that Insurers could produce no
evidence to support any of the contract-based defenses they alleged and, inter alia,
contended that the "Excluding Leased-In Employees/Workers" language does not exclude
the Segers' claims from coverage as a matter of law. (16) As such, a determination that
Insurers failed to present more than a scintilla of evidence of any of the defenses alleged
or that the Segers affirmatively negated each defense would require affirmation of the trial
court's summary judgment on the issue of coverage. (17) 

 The CGL policy includes, in its cover note, an exclusion of "Leased-In
Employees/Workers." This phrase is not defined by the policy. Insurers contend that a
standard "leased worker" exclusion was not included in the policy because a standard
"leased worker" exclusion was not established until 1993. Of note, the policy does include
a standard employee exclusion. The employee exclusion specifically excludes any liability
for claims asserted by, or on behalf of, Diatom/ECS employees from coverage under the
policy. Insurers contend that either Randall was actually an employee of Diatom and,
therefore, the Segers' claim is excluded by the standard employee exclusion or Randall
was "leased in" by Diatom from ECS and coverage is excluded based on the leased-in
worker exclusion contained on the CGL cover note. 

 The Segers claims are for bodily injury to Randall. The CGL policy generally covers
claims for bodily injury or property damage. Thus, there is no dispute that the CGL policy
generally covers the kind of claims alleged by the Segers. However, the parties hotly
contest the application of the leased-in worker/employee exclusion to the Segers' claim. 
Once general coverage is established, the burden of proving the existence and applicability
of a policy exclusion rests with Insurers. Tex. R. Civ. P. 94; Comsys Info. Tech. Servs., Inc.
v. Twin City Fire Ins. Co., 130 S.W.3d 181, 193 (Tex.App.-Houston [14th Dist.] 2003, pet.
denied); Venture Encoding Serv., Inc. v. Atl. Mut. Ins. Co., 107 S.W.3d 729, 733
(Tex.App.-Fort Worth 2003, pet. denied). 

 The interpretation of insurance policies is governed by the same rules of
construction applicable to other written contracts. State Farm Life Ins. Co. v. Beaston, 907
S.W.2d 430, 433 (Tex. 1995). In construing a written contract, the court's primary concern
is to ascertain the true intentions of the parties as expressed in the instrument. Id.; Coker
v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). Terms in an insurance contract will be given
their ordinary meaning unless the policy shows that the words were meant in a technical
or different sense. Sec. Mut. Cas. Co. v. Johnson, 584 S.W.2d 703, 704 (Tex. 1979). We
must read all parts of the contract together and must strive to give meaning to every
sentence, clause, and word to avoid rendering any portion inoperative. Balandran v.
Safeco Ins. Co. of Am., 972 S.W.2d 738, 741 (Tex. 1998). If, after applying these rules
of construction, an insurance policy remains ambiguous, we are to construe the language
in a manner that favors coverage. Beaston, 907 S.W.2d at 433.

 Looking to the CGL policy, the phrase "Leased-In Employees/Workers" is not
defined anywhere in the policy. No standard leased worker exclusion is included in the
policy. Reading all of the parts of the policy reveals that every exclusion in the contract
excludes coverage for claims of insureds' liability related to or arising from the event or
persons identified by the various exclusions. The ordinary meaning of "lease" is an
agreement for possession or use of property for a specified period or at will in exchange
for a specified rent or compensation. See Merriam-Webster's Collegiate Dictionary
798 (Frederick C. Mish, ed., 11th ed. 2003); Black's Law Dictionary 898 (7th ed. 1999).
The ordinary meaning of "worker" is a person that "exerts strength or faculties to do or
perform something." Merriam-Webster's Collegiate Dictionary 1442-43 (Frederick C.
Mish, ed., 11th ed. 2003). The ordinary meaning of the word "in," when used as a modifier,
is directed toward some destination or place. Merriam-Webster's Collegiate Dictionary
627 (Frederick C. Mish, ed., 11th ed. 2003). Therefore, we conclude that, applying the
ordinary meaning to the words used in the CGL policy and striving to give meaning to every
part thereof, the condition "Excluding Leased-In Employees/Workers," as a matter of law,
unambiguously excludes from coverage all claims for a named insured's liability for bodily
injury or property damage brought by or on behalf of persons that perform work for the
insured under an agreement with another allowing temporary use of the worker, even
though the leased worker would not be an employee of insured. (18) 

 Looking to the testimony of Cynthia Gillman at the underlying Seger v. Diatom trial,
Gillman testified that ECS had a Contract for Personnel Services with Diatom by which
ECS would supply workers to perform work in fulfillment of Diatom's drilling contracts. 
Gillman testified that Randall Seger was an employee of ECS that was doing work at the
Diatom drilling site at the time of his death. Considering this evidence in the light most
favorable to Insurers and indulging all reasonable inferences in their favor, we conclude
that there is more than a scintilla of evidence that the Segers' claims were excluded by the
CGL policy. Further, we cannot say that the Segers have negated the applicability of the
CGL policy's "Excluding Leased-In Employees/Workers" condition as a matter of law. 
Therefore, we conclude that the trial court erred in granting the Segers summary judgment
on the issue of coverage.

 The Segers contend that the leased-in worker exclusion is ambiguous because the
exclusion could reasonably be construed to exclude leased-in workers from being
"insureds" under the policy, claims made by leased-in workers, or all claims, including
wrongful death claims asserted by survivors of the leased-in worker, arising from the
leased-in worker relationship. However, as indicated above, when the CGL policy's
provisions are read together, we conclude that the exclusion excludes from coverage all
claims for a named insured's liability for bodily injury or property damage brought by or on
behalf of persons that perform work for the insured under an agreement with another
allowing the temporary use of the worker. Thus, our construction of this condition excludes
coverage for all claims for bodily injury or property damage whether brought by or on behalf
of leased-in workers. We do not find the Segers' interpretation of the condition as
excluding leased-in workers from being "insureds" reasonable, since the CGL policy
specifically identifies those parties, Diatom and ECS, that were "insureds" and would not
need to specifically identify others as not being "insureds." (19)

 Having concluded that the trial court erred in granting summary judgment on the
issue of coverage, we reverse that portion of the summary judgment. We affirm the trial
court's denial of Insurer's motion for summary judgment on the issue of coverage.

D. Demand Within Limits

 To prove an insurer's negligent failure to settle a claim, i.e., a Stowers claim, the
insured must establish that (1) the claim is within the scope of coverage, (2) a demand was
made that was within policy limits, and (3) the demand was such that an ordinary prudent
insurer would have accepted it, considering the likelihood and degree of the insured's
potential exposure to an excess judgment. Am. Physicians Ins. Exch. v. Garcia, 876
S.W.2d 842, 849 (Tex. 1994). A demand that exceeds the policy limits, even though
reasonable, does not trigger the insurer's duty to settle. Id. Insurers contend that, since
the policy provided that each insurer was severally liable, the Segers' collective settlement
offers were ineffective to trigger Insurers' Stowers liability because the Segers failed to
make settlement demands within the several limits of Yorkshire and Ocean Marine. The
Segers contend that their collective settlement demands were within the solvent policy
limits available under the CGL policy and were sufficient to meet the second Stowers
element. Further, the Segers rely on the CGL insurers' admission that the Segers made
a demand that was within the available policy limits. 

 The terms of the CGL policy provided that, in exchange for premium payments
totaling $10,850, (20) the CGL insurers would provide coverage for the period of January 23,
1992 through January 23, 1993, with policy limits of $500,000 per accident/occurrence. 
The cover note, which was incorporated into the policy, indicated that Yorkshire insured
16.472 percent of the policy and that Ocean Marine insured 10 percent of the policy. It is
undisputed that the Segers did not make demands upon Yorkshire and Ocean Marine
separately that would fall within their proportionate share of the policy's limits. However,
it is also undisputed that the Segers did make demand for the stated policy limits,
$500,000, and subsequently made demands for $368,190 and $250,000. In fact, at
Insurers' request, the trial court took judicial notice that the Segers offered to settle the
underlying case for $250,000. Thus, the facts related to this issue are not in dispute. 
Rather, the question presented is whether the Segers' collective settlement demand for
$250,000 was sufficient to meet the "demand within policy limits" element of a Stowers
action or were the Segers required to make separate demands upon each of the CGL
insurers within each insurer's proportionate share of the policy's limits.

 In a typical Stowers action, an insured brings suit against his insurer for the insurer's
negligent failure to settle a covered claim asserted against the insured for an amount within
the applicable policy limits when the covered claim results in a judgment in excess of the
policy limits. However, before an insured can prevail in a Stowers action, the claimant in
the underlying proceeding must have made a settlement demand that was within the
applicable policy limits. Id. Thus, it is the claimant in the underlying suit that determines
whether the second element of a Stowers claim can be met by the insured. As a result,
we believe that a claimant should be entitled to rely on the specific provisions of an
insurance policy in making a settlement demand that is within the coverage of the policy. 
That it is the policy that dictates whether a settlement demand was within policy limits is
bolstered by the Texas Supreme Court's indication that a settlement demand that proposes
to release the insured for "the policy limits," in lieu of a demand for a sum certain, is
sufficient to satisfy the "demand within limits" element of a Stowers action. See Id. at 848-49. Further, when a claimant makes such a demand and it is rejected by the insurer, we
believe that proof that a settlement demand that was within the limits stated in the policy
and that was rejected by the insurer is all that is necessary to satisfy the "demand within
limits" element of a Stowers claim. Thus, in the present case, we conclude that the Segers'
collective settlement demand of $250,000, which falls within the $500,000 limit stated in
the policy, was sufficient to satisfy the second element of a Stowers action against
Insurers. (21) As the undisputed facts establish that the Segers made a settlement demand
that was within the CGL policy limits as a matter of law, we affirm the trial court's grant of
summary judgment in favor of the Segers on this issue.

Damages

 Insurers contend that the Segers presented no evidence to establish that Diatom
suffered injury as a result of any negligence on the part of Insurers and, therefore, the trial
court's grant of directed verdict as to damages was in error. Insurers contend that (1)
Diatom was judgment proof and, therefore, was not injured by Insurers' negligence, (2)
directed verdict was an improper method to determine damages, and (3) because the
underlying judgment was not the result of a fully adversarial trial, it constituted no evidence
of damages. The Segers contend that Diatom's financial condition is immaterial to
Insurers' Stowers liability and that, because the damages awarded in the underlying
judgment were the result of a fully adversarial trial, the damages awarded in that judgment
are conclusive of the damages Diatom suffered as a result of Insurers' negligence. We will
address each of Insurers' subpoints regarding this issue in the order in which they were
presented. 

 In reviewing the granting of a no-evidence summary judgment, we must decide
whether any probative evidence was presented that would raise a genuine issue of
material fact regarding the issue upon which the summary judgment was granted. Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 241-42 (Tex. 2001) (per curiam). This is the same
standard utilized in reviewing a directed verdict. See King Ranch, Inc. v. Chapman, 118
S.W.3d 742, 750-51 (Tex. 2003). In determining if the evidence raises a genuine issue of
material fact, we review the evidence in the light most favorable to the party against whom
the verdict is rendered. Morgan v. Anthony, 27 S.W.3d 928, 929 (Tex. 2000). 

 Insurers contend that, because Diatom was unable to pay any damages awarded
by the judgment, the Segers cannot prove that Diatom suffered any harm as a result of
Insurers' negligent refusal to settle the Segers' claims when demand was made within
policy limits. The record does establish that Diatom is and was judgment proof. Diatom
ceased doing business in 1993, sold all of its assets to make payments to creditors, and
was involuntarily dissolved. As a result, Diatom possessed no assets from which it could
pay any damages awarded to the Segers. 

 Insurers' contention is analogous to the argument made by the insurer in YMCA of
Metro. Fort Worth v. Commercial Standard Ins. Co., 552 S.W.2d 497 (Tex.Civ.App.-Fort
Worth 1977, writ ref'd n.r.e.). In YMCA, the insurer argued that, because its insured had
entered into a covenant with the plaintiffs not to execute the judgment against the insured,
the insured had no obligation to pay the judgment and, consequently, was not harmed by
the insurer's negligent refusal to settle. Id. at 501. The court analyzed the language in the
policy at issue and concluded that the policy was a liability policy rather than an indemnity
policy. Id. at 504. Notably, the court cited the policy's provision that, "The company will
pay on behalf of the insured all sums which the insured shall become legally obligated to
pay as damages . . . ." After discussing the differences between a liability policy and an
indemnity policy, (22) the court concluded that the policy was a liability policy and that the
covenant not to execute did not release the insurer from liability, even though the insured
was under no legal obligation to pay the damages awarded. See id.

 The CGL insurance policy involved in the present case includes the exact language
cited above in the YMCA policy. From this and other provisions of the policy, we conclude
that the CGL policy is a liability policy rather than an indemnity policy. Therefore, we
conclude that Diatom's inability to pay the damages awarded in the underlying judgment
does not affect Diatom's liability under the judgment. See id. at 504. Thus, the fact that
Diatom was judgment proof does not establish Insurers' right to directed verdict on
damages. 

 As support for its contention, Insurers cite Foremost County Mut. Ins. Co. v. Home
Indem. Co., 897 F.2d 754, 757 (5th Cir. 1990), as holding that an underlying judgment
constitutes no evidence of damages in a Stowers action if the judgment is accompanied
by a covenant not to execute against the insured. (23) The Foremost court, however,
recognized the general rule that "[i]n Texas a covenant not to execute by an insured does
not release an insurance carrier from liability." Id. at 758 (citing YMCA, 552 S.W.2d at 504-05). Further, the Foremost court specifically indicated that, "under our decision not to
extend the YMCA rule the insurer who negligently refuses to settle will be able to use a
covenant not to execute only to the disadvantage of another insurer that has breached its
duty to the insured . . . and not to the disadvantage of its insured." Id. at 760 (emphasis
added). We conclude that the Foremost opinion is not controlling because it is clearly
distinguishable from the present case. See Tex. Farmers Ins. Co. v. Soriano, 844 S.W.2d
808, 824-25 (Tex.App.-San Antonio 1992), rev'd on other grounds, 881 S.W.2d 312 (Tex.
1994) (discussing the limited application of the holding in Foremost). We affirm the trial
court's denial of Insurers' motion for directed verdict as to damages.

 Next, we must consider whether the trial court erred in giving conclusive effect to the
damages found in the underlying judgment. (24) By directing verdict on the issue of damages
in accordance with the damages found in the underlying judgment, it is evident that the trial
court found that the judgment set Diatom's damages as a matter of law. Insurers'
contention that directed verdict was an inappropriate vehicle to establish damages is
premised on their position that the evidence that Diatom was judgment proof raised a fact
issue regarding whether Diatom was damaged by the excess damages awarded in the
underlying judgment. However, for the reasons discussed above, we conclude that
Diatom's financial status is immaterial to Diatom's liability and, therefore, fails to raise a
fact issue regarding damages in the present suit.

 A directed verdict is appropriate only when "reasonable minds can draw only one
conclusion from the evidence." Collora v. Navarro, 574 S.W.2d 65, 68 (Tex. 1978). 
Review of a directed verdict requires that the evidence be viewed in the light most
favorable to the party against whom judgment was entered and that all reasonable
inferences from that evidence be resolved in that party's favor. Morgan, 27 S.W.3d at 929.

 The general rule is that, in a Stowers action, damages are fixed as a matter of law
in the amount of the excess of the judgment rendered in the underlying suit in favor of the
plaintiff over the applicable limits of the policy. See Allstate Ins. Co. v. Kelly, 680 S.W.2d
595, 606 (Tex.App.-Tyler 1984, writ n.r.e.). See also Rocor Int'l, Inc. v. Nat'l Union Fire
Ins. Co. of Pittsburgh, Pa., 77 S.W.3d 253, 271 (Tex. 2002) (Baker, J., dissenting); State
Farm Fire & Cas. Co. v. Gandy, 925 S.W.2d 696, 713 (Tex. 1996). Thus, absent evidence
that the underlying judgment is not reliable evidence of the damages suffered by the
insured in the underlying suit, the judgment conclusively establishes the damages suffered
by the insured and is sufficient evidence to support a directed verdict.

 While the general rule is that a judgment obtained by a plaintiff against an insured
is conclusive to establish the amount of damages suffered by the insured in a subsequent
Stowers action, see Kelly, 680 S.W.2d at 606, the Texas Supreme Court has created an
exception to this general rule when the insured assigns his Stowers action to the plaintiff
in the underlying suit, see Gandy, 925 S.W.2d at 714. When such an assignment occurs,
the underlying judgment is not only not conclusive, but is inadmissible as evidence of
damages, unless rendered as the result of a "fully adversarial trial." Id. Insurers contend
that they presented evidence that would raise a fact question as to whether the judgment
from the underlying suit was the result of a fully adversarial trial and, therefore, that the trial
court erred in directing the verdict on damages in accordance with the underlying judgment.

 Prior to trial, the Segers filed a motion for partial summary judgment in which they
contended, inter alia, that the evidence established that the parties to the underlying suit
were in a "fully adversarial relationship at the time of trial" and that an "actual trial" had
occurred. The trial court granted the Segers' motion. However, we conclude that these
findings by the trial court do not resolve whether the judgment in the underlying suit was
the result of a fully adversarial trial. (25)

 At the close of evidence in the Stowers action, the Segers offered the judgment in
the underlying suit for the court's review only and moved the trial court for directed verdict
on damages based on the judgment. Insurers objected to admission of the judgment
contending that it was not the result of a fully adversarial trial. The trial court overruled
Insurers' objection and granted the Segers' motion for directed verdict on damages. 

 Directed verdict was proper, in this situation, only if no probative evidence was
presented that would raise a genuine issue of material fact regarding the amount of
damages suffered by Diatom as a result of Insurers' negligent failure to settle the
underlying suit. See Dow Chem. Co., 46 S.W.3d at 242. As the Segers' only evidence of
damages in the Stowers action was the judgment in the underlying suit, the trial court could
only direct the verdict on damages if Insurers failed to raise a genuine issue of material fact
regarding the reliability of the judgment as evidence of Diatom's damages.

 Insurers raised the question of whether the judgment in the underlying action was
the result of a fully adversarial trial. As evidence that it was not, Insurers correctly indicated
that Diatom was not represented by counsel at the trial in the underlying suit, made no
opening or closing statements, offered no evidence, and conducted no cross-examination
of the Segers' witnesses. Further, Insurers cite the trial court's own characterization of this
proceeding as a nihil dicit prove up. 

 We conclude that this evidence is sufficient to raise a genuine issue of material fact
regarding whether the underlying judgment upon which the trial court directed the verdict
on damages was the result of a fully adversarial trial. See Gandy, 925 S.W.2d at 714. (26) 
As such, we reverse the damages portion of the judgment.

Evidentiary Exclusions

 Insurers contend that they were denied evidence of collusion between the Segers
and Diatom in the underlying proceeding because the trial court abused its discretion in
sustaining Diatom's assertions of attorney-client privilege and work product privilege. As
Insurers' issue challenges the exclusion of those documents that specifically relate to the
underlying judgment and subsequent assignment, we will limit our review to those
documents. (27) We must determine whether the trial court abused its discretion in upholding
Diatom's assertions of privilege and, if so, whether the exclusion of this evidence harmed
Insurers. See May v. Barton's Pump Serv., Inc., 153 S.W.3d 469, 477-78
(Tex.App.-Amarillo 2004, no pet.).

 Some of the evidence sought by Insurers was included in the appellate record in this
cause. These documents were made part of the record on December 28, 2004. They
were included in the appellate record after Diatom asserted its claims of privilege. Nothing
in this court's file evidences any attempt by Diatom to recall these documents as
privileged. (28) See Tex. R. Civ. P. 193.3(d). Therefore, for the present litigation, we
conclude that Diatom's prior assertion of privilege as to these documents has been waived. 

 Using these disclosed documents, Insurers contend that other documents relating
to the underlying proceeding are discoverable and admissible. After reviewing all of the
documents provided to the trial court for in camera inspection, the documents Insurers
seek by this issue are duplicates of the documents that were included in the appellate
record. As Diatom's prior assertions of privilege regarding these documents have been
waived, we overrule Insurers' issue as moot. 

Recusal of Judge

 Insurers contend that the denial of their motion to recuse Judge LaGrone was an
abuse of discretion because, as the judge that presided over the underlying trial, Judge
LaGrone was a vital material witness in the Stowers suit and had personal knowledge of
disputed material facts. The denial of a motion to recuse is reviewed for abuse of
discretion. Brosseau v. Ranzau, 81 S.W.3d 381, 399 (Tex.App.-Beaumont 2002, pet.
denied). Insurers contend that the Segers' citation to Judge LaGrone's statement in the
underlying trial transcript that "The Court will call for trial in Cause No. 30,110, . . ." made
Judge LaGrone a vital material witness in the Stowers action. However, the complete
transcript of the underlying proceeding, which includes the statement Insurers complain of,
was admitted into evidence in the Stowers action. Further, Judge LaGrone's calling the
underlying proceeding for trial did not constitute his participation "as . . . material witness
in the matter in controversy." Tex. R. Civ. P. 18b(2)(d). Certainly, as addressed above,
Insurers may refute Judge LaGrone's characterization of the underlying proceeding as a
"trial," but we do not conclude that the trial court abused its discretion in denying Insurers'
motion for recusal on this basis.

 Additionally, Insurers contend that Judge LaGrone must have knowledge of disputed
evidentiary facts regarding whether the underlying proceeding was, in fact, a fully
adversarial trial. However, Insurers fail to identify any specific knowledge of disputed
evidentiary facts purportedly held by Judge LaGrone. We will not find recusal appropriate 
solely on the basis of speculation regarding facts that may or may not be known by the
presiding judge.

 We overrule Insurers' challenge to the denial of their motion to recuse.

Disqualification of Counsel

 Finally, Insurers contend that two attorneys in the Segers' counsel, Brian Heinrich
and Joe Hayes, were disqualified from representing the Segers in their Stowers action
because each (1) were witnesses in the Stowers action, see Tex. Disc. R. Prof. Cond.
3.08, and (2) were to be paid on a contingent basis, see Tex. Disc. R. Prof. Cond. 3.04. 
The denial of a motion for disqualification is reviewed for abuse of discretion. See Metro.
Life Ins. Co. v. Syntek Fin. Corp., 881 S.W.2d 319, 321 (Tex. 1994). As both parties to the
present dispute acknowledge, the disqualification of counsel is a severe remedy, which is
not to be invoked lightly. See In re Nitla S.A. de C.V., 92 S.W.3d 419, 422 (Tex. 2002). 
Even if challenged counsel has committed a disqualifying act, the party requesting
disqualification must demonstrate that counsel's conduct caused actual prejudice. Id. 

 Assuming, without deciding, that Heinrich and/or Hayes were lawyer-witnesses such
that they would be disqualified from representing the Segers in the Stowers action, Insurers
have failed to present any evidence that they were harmed. Insurers cite a deposition of
Professor Bob Schuwerk, which is not a part of the record, as concluding that Heinrich and
Hayes violated Rules 3.04 and 3.08 of the Texas Disciplinary Rules of Professional
Conduct. However, proof that an attorney violated a Rule of Professional Conduct, without
a further showing of harm, is insufficient to justify disqualification. Id. Nothing in Insurers'
discussion of Schuwerk's deposition identifies how they were harmed by any alleged
violation of the Rules by either Heinrich or Hayes. 

 Insurers contend that the trial court took certain unrelated actions to avoid having
to rule that Heinrich and Hayes were disqualified to represent the Segers in the Stowers
action, however, this contention is wholly unsupported by evidence and is purely
speculative. See Miller v. Hood, 536 S.W.2d 278, 285 (Tex.Civ.App.-Corpus Christi 1976,
writ ref'd n.r.e.) (presumption of regularity and validity of trial court rulings unless facially
invalid or invalidity shown in the record). Additionally, while Insurers contend that Hayes
and Heinrich were disqualified because they were witnesses whose payment was
contingent upon the outcome of the case, Insurers fail to identify any evidence establishing
that Hayes or Heinrich were being paid on a contingent basis. 

 We overrule Insurers' issue regarding the denial of their motion to disqualify Hayes
and Heinrich.

Conclusion

 We affirm the trial court's denial of Insurers' motion to recuse, denial of Insurers'
motion to disqualify counsel, and grant of summary judgment on the issue of whether the
Segers made a sufficient settlement demand within the CGL policy limits. In all other
respects, we reverse the judgment and remand this cause for new trial consistent with this
opinion. 


 Mackey K. Hancock

 Justice




1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by
assignment. 
2. See generally G.A. Stowers Furniture Co. v. Am. Indem. Co., 15 S.W.2d 544, 548
(Tex.Comm'nApp. 1929, holding approved).
3. We note that the trial court also entered summary judgment regarding issues
related to damages, but, as the damages issue was ultimately decided by directed verdict,
we will address it separately.
4. Further reference to current provisions of the Insurance Code will be by reference
to "section __" or "§ __."
5. Further citation to the pre-amendment version of article 1.14-1 will be by reference
to "former article 1.14-1, § __." Further citation to the post-amendment version of article
1.14-1 will be by reference to "amended article 1.14-1, § __."
6. Further citation to the pre-amendment version of article 1.14-2 will be by reference
to "former article 1.14-2, § __." Further citation to the post-amendment version of article
1.14-2 will be by reference to "amended article 1.14-2, § __."
7. Recently, the Texas Supreme Court clarified that the effect of the post-amendment
provisions applicable to this case is to preclude unauthorized insurers from enforcing its
policies. See Lexington Ins. Co. v. Strayhorn, 209 S.W.3d 83, 89 (Tex. 2006). Thus, we
conclude that the Texas Supreme Court has specifically rejected Insurers' contention that
the applicable provisions do no more than preclude an unauthorized insurer from bringing
suit.
8. Other Texas courts have likewise applied post-amendment unauthorized and
surplus lines insurance provisions retroactively, even when the policies were issued prior
to 1993. See Lexington Ins. Co., 209 S.W.3d at 85, 89-90 (applying post-amendment
article 1.14-1, § 11, to case involving insurance tax dispute covering taxes accruing from
1992 through 1995); Mid-Am. Indem. Ins. Co., 22 S.W.3d at 325 (requiring eligibility under
post-amendment article 1.14-2 as prerequisite to bond exemption, even though the
exemption specifically required eligibility at the time coverage issued, which was prior to
1993 amendments); Wheelways Ins. Co. v. Hodges, 872 S.W.2d 776, 779, 784 n.10
(Tex.App.-Texarkana 1994, no writ) (applying amended article 1.14-1, § 8, to case
involving accident occurring in 1989 with suit against insurer filed in 1991).
9. The same restriction on the enforcement of unauthorized insurance contracts may
be found in both the former and amended law. See amended article 1.14-1, § 8; former
article 1.14-1, § 8.
10. Reference to the pre-amendment version of article 1.14-2, reveals that there was
no section 6A. As section 6A was added by the 1993 amendments, but it did no more than
authorize the establishment of the Surplus Lines Stamping Office. See amended article
1.14-2, § 6A.
11. Specifically, the certification provides that Yorkshire was "an unlicensed insurer
which is an eligible insurer for providing surplus lines insurance under article 1.14-2, Texas
Insurance Code from September 1, 1989 thru November 12, 2001 and from July 1, 2002
thru the present."
12. Specifically, the certification provides that Ocean Marine was "an unlicensed
insurer which is an eligible insurer for providing surplus lines insurance under article 1.14-2,
Texas Insurance Code from November 1, 1989 thru the present."
13. Further, we note that the Segers do not contest Insurers' general eligibility to
provide surplus lines insurance.
14. Relating to local recording agent licenses.
15. We note that evidence was offered relating to this issue by Insurers, but this
evidence was objected to by the Segers, the objection was sustained by the trial court, and
Insurers failed to challenge the trial court's ruling on appeal.
16. By their appeal, Insurers urge error only in regard to the leased-in worker
exclusionary defense to coverage. Thus, any objection to any other contractual defense
has been inadequately briefed and is waived. See Knie v. Piskun, 23 S.W.3d 455, 460
(Tex.App.-Amarillo 2000, pet. denied); Lewis v. Deaf Smith Elec. Co-op., Inc., 768 S.W.2d
511, 512-13 (Tex.App.-Amarillo 1989, no writ.).
17. As we have previously determined that Insurers have failed to establish their right
to assert their contract-based defenses, Insurers would not be entitled to summary
judgment on coverage, even if they established that a contractual provision excluded
coverage as a matter of law. See Tex. R. App. P. 47.1. 
18. We focus on the term "worker" in an effort to harmonize the provisions of the
policy. Claims for bodily injury by a leased-in worker that concurrently holds the status of
an employee would be covered under the standard employee exclusion contained in the
CGL policy. Thus, an exclusion for a leased-in employee would be redundant. 
19. We note that the Segers' present no alternative interpretation of the phrase
"leased-in employee/worker." Other than the interpretation identified in this opinion, we can
identify no other reasonable interpretation of this phrase and, therefore, conclude that the
phrase is unambiguous.
20. No issue has been raised regarding the timely payment of these premiums.
21. We express no opinion regarding what, if any, effect the insolvency of certain
severally liable insurers would have on whether a demand within stated policy limits, but
exceeding the solvent insurers' proportionate share of coverage, would have on the
establishment of a "demand within limits" in the context of a subsequent Stowers action. 
In the present case, it is undisputed that, when the Segers made their $250,000 demand,
the demand was within the available policy limits of the solvent CGL insurers.
22. An insurer in a liability policy agrees to defend the insured and protect it from
liability. If the insurer is unsuccessful in protecting insured from liability and must settle or,
if a judgment is rendered against the insured, the insured is not required to pay the
obligation before the insurer is required to pay. If a judgment is rendered against the
insured, the insurer's liability to pay attaches at that time. This obligation to pay continues
until the judgment is satisfied.

 Conversely, an indemnity policy provides that the insurer's liability does not attach
unless the judgment against the insured has actually been paid.

 See id. at 504.
23. While the Segers entered into a covenant not to execute the judgment against
Gillman in the present case, we understand Insurers' argument to analogize a covenant
not to execute with a judgment proof insured. However, we conclude that the analysis and
the result would be the same if Insurers were contending that the covenant not to execute
precluded proof of harm to Diatom.
24. Insurers contend that it was error for the judgment to have been admitted into
evidence for the judge's eyes only. However, the judgment was admitted into evidence. 
Because the trial court gave the judgment conclusive effect on the issue of damages and
rendered a directed verdict in accordance with that judgment, the fact issue of the amount
of damages suffered by Diatom was removed from the jury's consideration. Therefore,
whether the trial court erred in the manner in which it admitted the judgment is subsumed
within the issue of whether the trial court erred in directing damages in accordance with this
judgment and will be addressed below.
25. In reviewing the Segers' motion relating to these points, we note that the "fully
adversarial relationship" issue in no way addressed the events occurring at the underlying
trial. While the Court did not define "fully adversarial trial" in Gandy, we believe that a
determination of whether a hearing constitutes a "fully adversarial trial" requires a review
of the extent to which the parties to the proceeding participated. See Gandy, 925 S.W.2d
at 713. When the judgment is an agreed judgment, default judgment, or when the
underlying defendant's participation is so minimal as to evidence that the hearing was not
adversarial, the judgment resulting from that hearing may not be admitted as evidence of
damages in the Stowers action. See id. at 713, 714. As such, the determination of
whether the hearing was fully adversarial requires review of the underlying proceedings.
26. "In no event, however, is a judgment for plaintiff against defendant, rendered
without a fully adversarial trial, binding on defendant's insurer or admissible as evidence
of damages in an action against defendant's insurer by plaintiff as defendant's assignee"
(emphasis added).
27. The documents submitted for the trial court's in camera review include documents
that were prepared for the purpose of facilitating the rendition of legal services in defense
of Insurers' third-party action against Diatom. These documents appear to be privileged
under Texas Rule of Evidence 503(b), but, in any event, are not sought by Insurers through
this issue.
28. However, the conclusion that Diatom has not attempted to "snap back" these
documents is not a determination that it has waived its claim of privilege. Because Diatom
is no longer a party to the present action, Insurers' identification of the disclosure of these
documents does not necessarily result in Diatom's actual knowledge of the disclosure.